# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### NORTHERN DIVISION
#### No. 2:25-CV-00026-D

| | |
|---|---|
| **Teresa Lynn Northrup,** | |
| Plaintiff, | |
| v. | **Memorandum & Recommendation** |
| **Commissioner of Social Security**, | |
| Defendant. | |

Plaintiff Teresa Northrup challenges an Administrative Law Judge's decision to deny her application for social security income. Northrup claims that the ALJ made two errors in reaching that decision. First, the ALJ failed to offer sound reasons for rejecting Northrup's statements. And second, she erred in evaluating the medical opinion evidence. Both Northrup and Defendant Frank Bisignano, Commissioner of Social Security, seek a decision in their favor. D.E. 10, 12, 13.

After reviewing the parties' arguments, the court has determined that the ALJ erred in her determination. In declining to fully endorse Northrup's statements, the ALJ referenced finding that tend to support, rather than undermine, her allegations about her symptoms. And the ALJ did not explain why the residual functional capacity (RFC) omits a limitation offered in a medical opinion the ALJ deemed persuasive. So the undersigned recommends that the court grant Northrup's request for relief, deny Bisignano's request for relief, and remand this matter to the Commissioner for further consideration.[1]

---

[1] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b). D.E. 14.

## I.    Background

### A.    Factual

A few years before her alleged disability began, Northrup suffered two strokes. Tr. at 21. As a result, she had trouble with memory and could not take some medications because she took a blood thinner. *Id*.

Northrup has a history of knee pain, with the left more problematic, and reported it to her primary provider in November 2021. Tr. at 22. Around this time, Dr. Gary Shilling performed a consultative examination. Tr. at 24. Northrup had a normal memory, but her concentration was "not good." *Id*. And most days, she had extreme pain in her knees and feet. Tr. at 349. Dr. Shilling noted mild swelling with tenderness in her left knee with reduced flexion. Tr. at 24. She displayed some hip weakness and a steady gait. *Id*. Northrup had trouble squatting and rising, walking on her heels and toes, and standing and hopping with her left foot. *Id*. Dr. Shilling concluded that she had mild limitations in walking and some mild limitations with crouching and squatting. Tr. at 25.

Two months later, Janice McGilberry and Dr. Shiahna Dye performed a consultative psychological evaluation. Tr. at 26. Northrup denied any psychological symptoms but noted memory problems stemming from her stroke, having taken special education classes, and difficulty getting around her home. Tr. at 26, 388. She displayed adequate attention and concentration but some difficulty with recall. Tr. at 26. The examiners estimated her cognitive abilities to be borderline to low average. *Id*.

The psychological consultants opined that Northrup could understand, retain, and follow simple instructions to perform simple, routine, repetitive tasks. *Id*. But she may struggle to

2

maintain concentration, persistence, and pace for more complex tasks. *Id*. Northrup appeared capable of interacting with others and managing simple work-related stress. *Id*.

In June 2022 orthopedic appointment, Northrup noted constant knee pain rated as eight out of ten in intensity. Tr. at 22. Northrup also complained of residual weakness from a stroke several years earlier. Tr. at 23. Past treatment with steroids had become less effective. *Id*.

An examination showed crepitus, weakness, mild valgus, and a mildly antalgic gait because of mild weakness in her quadriceps. *Id*.  X-rays revealed sclerosis that was almost bone-on-bone, as well as osteophytes and a slight valgus alignment. *Id*. Providers recommended strengthening exercises before pursuing a total knee replacement. *Id*. And they suggested treatment with anti-inflammatories, steroid injections, and viscosupplementation injections. *Id*.

In August 2022 and April 2023, Northrup reported continuing knee pain that disrupted her sleep. Tr. at 437. Her primary care provider noted her antalgic gait. Tr. at 23. At an orthopedic appointment six months later, she again complained of ongoing knee pain with instability. *Id*. Northrup's pain caused difficulty with sleeping, walking, and changing positions. Tr. at 551. Past steroid injections provided only temporary relief. Tr. at 23.

An examination found tenderness, crepitus, an abnormal gait, and a mildly positive results on a patellar compression test. Tr. at 23, 555. Updated x-rays revealed severe degenerative changes of the patellofemoral compartment with mild to moderate degeneration in the medial and lateral compartments. Tr. at 23. Having no significant improvement with treatment modalities received, Northup considered whether to continue conservative management or undergo a total knee replacement. *Id*.

Northrup also suffers from diabetes and hypertension, both of which medication keeps under control. *Id*. She has reported no diabetic complications and has had normal blood pressure

levels. *Id*. Northrup also has hyperlipidemia with chronically elevated lipid values despite medication. *Id*.

State agency physicians determined that Northrup could perform light work with frequent pushing and pulling with her left leg and occasional postural movements. Tr. at 25. And state agency psychological consultants concluded that she had no medically determinable mental impairment. Tr. at 26.

Northrup testified that she could not work because of knee pain, described as bone-on-bone arthritis. Tr. at 21. She was a candidate for a total knee replacement, but she wanted to exhaust all other options before pursuing it. Tr. at 45. Different medications had not helped her symptoms, and Northrup hoped to obtain insurance approval for gel injections. Tr. at 21.

Northrup estimated that she could lift up to five pounds, sit and stand for about 15 minutes, and walk less than a block. *Id*. She drove short distances and relied on her family to handle household chores. *Id*. Each day, Northrup spent four to five hours lying down with her feet elevated. *Id*.

In a Third-Party Statement, Northrup's husband noted her constant leg pain and difficulty with mobility as well as postural movements. Tr. at 27. He also remarked that she had trouble with memory but no significant difficulty paying attention or following instructions. *Id*.

**B.      Procedural**

In August 2021, Northrup applied for disability benefits alleging a disability that began one month earlier. After the Social Security Administration denied her claim at the initial level and upon reconsideration, Northrup appeared for a videoconference hearing before an ALJ to determine whether she was entitled to benefits. The ALJ determined Northrup had no right to benefits because she was not disabled. Tr. at 17–29.

The ALJ found that Northrup lived with several severe impairments. Tr. at 19. These included diabetes mellitus, hypertension, hypercholesterolemia, obesity, a history of cerebrovascular disease with a cerebrovascular accident, and osteoarthritis of the left knee. *Id*. The ALJ also found that Northrup's impairments, either alone or in combination, did not meet or equal a Listing impairment. Tr. at 20.

Next, the ALJ determined that Northrup had the residual functional capacity (RFC) to perform light work with other limitations. Tr. at 21. She can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. *Id*. Northrup can occasionally balance, crouch, stoop, kneel, and crawl. *Id*. She cannot push or pull with her lower left extremity. *Id*. And Northrup must avoid concentrated exposure to workplace hazards including unprotected heights and moving machinery. *Id*.

Then the ALJ concluded that Northrup could perform her past relevant work as a general house worker as that work was actually performed. Tr. at 27–28. These findings led the ALJ to conclude that Northrup was not disabled. Tr. at 28.

After the Appeals Council declined review, Northrup commenced this action in May 2025. D.E. 1. Both parties seek the court to issue a decision in their favor. D.E. 10, 12, 13.

## II.  Analysis

Northrup maintains that the ALJ failed to offer sound reasons to decline to fully endorse her subjective statements about her symptoms. The ALJ cited records that do not discredit the symptoms she experienced. The ALJ identified no other evidence in the record that undermined Northrup's claims. So there were no grounds offered to discredit Northrup's statements about the limiting effects of her symptoms.

Northrup also challenges the ALJ's consideration of the consultative examiners' opinion. The ALJ found the evaluation persuasive, but the RFC contains no non-exertional limitations that address the consultative examiners' finding that Northrup would have difficulty maintaining concentration, persistence, and pace for non-simple tasks. The ALJ offered no explanation why the RFC excludes this restriction. So it is uncertain whether she overlooked this limitation or rejected it.

These errors form bases for remand.

### A.    Standard for Review of the Commissioner's Final Decision

When a claimant appeals the Commissioner's final decision, the district court considers whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively* v. *Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws* v. *Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). The court must affirm the Commissioner's decision if it is supported by substantial evidence. *Smith* v. *Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B.    Standard for Evaluating Disability

Under the Social Security Act, a claimant is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). ALJs use a five-step, sequential process when considering disability claims. 20 C.F.R. § 404.1520.

6

First, at step one, the ALJ considers whether the claimant is engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). If so, the claim is denied. *Id.*

Then, at step two, the ALJ looks at whether the claimant has a severe impairment or combination of impairments that significantly limit him from performing basic work activities. *Id.* § 404.1520(a)(4)(ii). If not, the claim is denied. *Id.*

Next, at step three, the ALJ compares the claimant's impairments to those in the Listing of Impairments. *Id.* § 404.1520(a)(4)(iii). If the impairment appears in the Listing or if it is equal to a listed impairment, the ALJ must find that the claimant is disabled. *Id.*

But if the ALJ concludes that a presumption of disability is unwarranted, the ALJ must then assess the claimant's residual functional capacity ("RFC"). A claimant's RFC "is the most work-related activity the claimant can do despite all of her medically determinable impairments and the limitations they cause." *Arakas* v. *Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 90 (4th Cir. 2020). Determining the RFC requires the ALJ to "first identify the claimant's 'functional limitations or restrictions' and assess the claimant's 'ability to do sustained work-related' activities 'on a regular and continuing basis'—i.e., '8 hours a day, for 5 days a week, or an equivalent work schedule.'" *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). The ALJ will then "express the claimant's Residual Functional Capacity 'in terms of the exertional levels of work[:] sedentary, light, medium, heavy, and very heavy.'" *Id.* (alteration in original).

After assessing the claimant's RFC, the ALJ, at step four, considers whether the claimant can perform his past work despite his impairments. *Id.* § 404.1520(a)(4)(iv). If the claimant can, the ALJ will deny the claim. *Id.* If the claimant cannot, the analysis moves on to step five.

This final step considers whether the claimant, based on his age, work experience, and RFC, can perform other substantial gainful work. *Id.* § 404.1520(a)(4)(v). If so, the claimant is not disabled; if so, they are considered disabled. *Id*.

The burden of proof shifts between the Commissioner and the claimant during the evaluation process. The claimant has the burden of proof on the first four steps, but the Commissioner bears it on the last one. *Pass* v. *Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C.      Subjective Statements

Northrup first argues that the ALJ erred in evaluating her subjective statements and concluding they were somewhat inconsistent with the evidence. She contends that the ALJ cited evidence that did not discredit Northrup's claims. The Commissioner maintains that the ALJ correctly found that the record did not support the extent of the limitations Northrup alleges. The undersigned finds that the ALJ failed to show how the evidence detracted from Northrup's statements about her symptoms.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016); 20 C.F.R. § 404.1529. First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain. 2016 WL 1119029, at *3; § 404.1529(b).

If the claimant clears this threshold, at the second step the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine how much they limit the claimant's ability to work. *Id*. In making that determination, the ALJ considers the "entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by

8

medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

The ALJ has full discretion to weigh the subjective statements with the objective medical evidence and other matters of record. *Craig* v. *Chater*, 76 F.3d 585, 595 (4th Cir. 1996) (holding that claimant's allegations of pain need not be accepted to extent that they conflict with the record). In a district court's review, the ALJ's findings are entitled to great weight because of the ALJ's ability to observe and evaluate testimony firsthand. *Shively*, 739 F.2d at 989–90.

No objective evidence is required in assessing the alleged symptoms at the second step. *Oakes* v. *Kijakazi*, 70 F.4th 207, 215 (4th Cir. 2023) (citing *Arakas*, 983 F.3d at 95). Instead, "a claimant is entitled to 'rely exclusively on subjective evidence to prove that [his] symptoms [are] so continuous and/or severe that they prevented [him] from working[.]'" *Id.* (citing *Arakas*, 983 F.3d at 96); *see also Shelley C.* v. *Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 360 (4th Cir. 2023) (error to discount subjective statements based on objective medical evidence, or a lack of it, where condition may not produce such evidence).

But the ALJ does not have to accept the claimant's statements at face value. *Hawley* v. *Colvin*, No. 5:12-CV-260-FL, 2013 WL 6184954, at *15 (E.D.N.C. Nov. 14, 2013). The ALJ must balance the record evidence, mindful that "inconsistencies in the objective medical evidence is one of the many factors" to consider in evaluating an individual's symptoms. SSR 16-3p, 2016 WL 1119029, at *5.

So although "contradictory evidence may discredit [claimant's] subjective statements . . . a mere absence of medical evidence should not." *Minchew* v. *Kijakazi*, No. 5:22-CV-214-FL, 2023 WL 5919333, at *8 (E.D.N.C. Aug. 21, 2023), *adopted by* 2023 WL 5916528 (E.D.N.C. Sept. 11, 2023); *see William J.* v. *Kijakazi*, Civ. No. 22-2962-BAH, 2023 WL 6518118, at *5 (D. Md. Oct.

5, 2023) ("[W]hile a claimant cannot be required to prove the extent and severity of their subjective complaints with objective evidence, such evidence—if it exists—may still be considered by the ALJ to evaluate those complaints.").

Northrup claimed that she could sit and stand for no more than 15 minutes, walk less than a block, and lift up to five pounds. Tr. at 22. She drove short distances and relied on family members for household chores. *Id*. And Northrup stated that she spent four or five hours a day lying down and elevating her legs. *Id*.

The ALJ noted Northrup's impairments could produce the symptoms she claimed. *Id*. But she declined to fully accept Northrup's statements about the intensity, persistence, and limiting effects of her symptoms, to the extent they conflicted with the RFC determination. *Id*.[2]

The ALJ pointed out that orthopedic records showed her mildly antalgic gait and quadriceps weakness. Tr. at 24. And the consultative examiner noted a steady, symmetric gait with mild lower left extremity weakness and difficulty squatting and walking on heels and toes. *Id.* These findings, the ALJ concluded, did not support Northrup's "extreme" limitations in sitting, standing, walking, lifting, and carrying. *Id*.

But the findings the ALJ referenced do not discredit Northrup's statements about her symptoms. Northrup argues that the ALJ did not identify records that undercut her allegations. The ALJ's review of the record fails to disclose how the evidence conflicts with Northrup's claims. So

---

[2] Such boilerplate language is problematic because it suggests that the ALJ determined the RFC before assessing the consistency of a claimant's statements. *See Mascio* v. *Colvin*, 780 F.3d 632, 639 (4th Cir. 2015) (error for ALJ to conclude claimant's statements were not credible because they were inconsistent with RFC because it "gets things backwards by implying that ability to work is determined first and is then used to determine the claimant's credibility.") (internal quotation marks omitted). An ALJ should instead compare a plaintiff's alleged functional limitations "to the other evidence in the record, not to [her RFC]." *Id*.

there is no "accurate and logical bridge" from the evidence to her conclusion that there were inconsistencies between Northrup's statements and other evidence. *See Brown* v. *Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 269 (4th Cir. 2017).

The ALJ's review of the records tend to support, and do not discredit, Northrup's statements. The November 2021 consultative examination found left knee swelling with tenderness, reduced knee flexion, and some lower extremity weakness. Tr. at 24. Northrup also had moderate difficulty with squatting and rising and walking on her heels and toes, and could not stand and hop on her left foot. *Id*.

Northrup experienced constant knee pain which she rated as eight out of ten in intensity in June 2022. Tr. at 22. Treatment with medications and steroids no longer relieved her symptoms. Tr. at 23. In addition to an antalgic gait and weakness, providers noted crepitus, reduced range of motion, and a mild bowing of her lower extremities. *Id*. Imaging studies revealed sclerosis that was almost bone-on-bone, along with osteophytes and a slight valgus alignment. *Id*. The findings corresponded to end stage osteoarthritis. *Id*. Northrup continued to display and antalgic gait at follow-up appointments over the next several months but did not want to undergo total knee replacement surgery. *Id*.

In October 2023, Northrup reported knee pain and instability. *Id*. An examination showed crepitus, an abnormal gait, and positive results with patellar compression. *Id*. Updated x-rays revealed severe degenerative changes in the patellofemoral compartment with mild to moderate changes in the medial and lateral compartments. *Id*. Medications, modified activities, and steroid injections provided so significant symptom improvement. *Id*. And Northrup was unsure whether to pursue knee replacement.

11

The ALJ also remarked that Northrup's BMI around 33 exacerbated her osteoarthritis and contributed to her pain. *Id.*

Along with Northrup's statements about her restrictions in exertional activities and her limited daily activities, her husband noted her constant lower extremity pain. Tr. at 27. He pointed out her abnormal gait and difficulty moving about. *Id*. She also had trouble with postural movements. *Id*.

Northrup points to shortcomings in the Commissioner's argument on this issue. First, he erroneously characterizes her position as one arguing that the ALJ discredited her claims based on a lack of objective evidence. *See Arakas,* 983 F.3d at 95 (holding that no objective evidence is required when assessing the intensity, persistence, and limiting effects of a claimant's symptoms). And second, the Commissioner references evidence suggesting Northrup is not disabled, which is a futile attempt to fill in the gaps in the ALJ's reasoning and constitutes an impermissible post hoc rationalization.

Given the evidence in the ALJ's decision, it is unclear what detracts from Northrup's statements about the limitations resulting from her symptoms. Examinations noting a "mildly antalgic" gait likely did not track her ambulation for more than a few minutes or several paces. So the assessments may fall short of revealing the pain she experiences after five minutes of walking, or with standing for 15 minutes. Tr. at 43–44. Nor is it evident what other findings the ALJ would expect osteoarthritis to yield to signal its severity. And it is hard to imagine how a person with end-stage osteoarthritis, described as bone-on-bone, whose obesity exacerbates her condition and pain symptoms, who is a candidate for knee replacement surgery and for whom less-invasive treatments have failed, would be able to stand or walk for six hours in an eight-hour workday and carry up to 20 pounds, as light work requires.

12

In sum, although the ALJ concluded that records did not support the extent of Northrup's limitations, the evidence she referenced does not discredit her claims. Lacking evidence that casts doubt on Northrup's statements about the limitations resulting from her symptoms, the ALJ offered no basis to discount her allegations.

Because the ALJ failed to offer sound reasons to reject them, she erred in considering Northrup's statements. So this issue forms a basis for remand.

### D.      Medical Opinion Evidence

Northrup next argues that the ALJ erred in evaluating the consultative psychological examiners' opinion. She found their conclusions persuasive, yet the RFC omitted, without explanation, a limitation it assessed finding that Northrup may have difficulty maintaining concentration, persistence, and pace for complex tasks. The Commissioner asserts that the ALJ properly evaluating the medical opinions. The undersigned concludes that there is merit to Northrup's claims that the ALJ erred in considering this evidence.

The Regulations direct the ALJ to consider each medical opinion in the record. 20 C.F.R. §§ 404.1520c, 416.920c. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the [following] abilities ...

> (A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

> (B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

13

(C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id.* §§ 404.1520(a)(2), 416.913(a)(2).

The Regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors:

> (1) supportability, meaning that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ... the more persuasive the medical opinions or prior administrative medical finding(s) will be"; (2) consistency, meaning that the more consistent an opinion is with other evidence in the record, the more persuasive the medical opinion will be; (3) the medical source's relationship with the claimant, which considers the length of the treating relationship, frequency of examinations, purpose of the treating relationship, extent of the treatment relationship, and whether the medical source examined the claimant; (4) specialization, meaning that "a medical source who has received advanced education and training to become a specialist may be more persuasive"; and (5) other factors that tend to support or contradict a medical opinion."

*Id.* §§ 404.1520c(c)(1)–(5), 416.920c(c)(1)–(5).

Supportability and consistency are the "most important" factors, and the ALJ must discuss how they considered these factors in the written opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may explain their consideration of the other factors but need only do so when contrary medical opinions are equally persuasive in terms of both supportability and consistency. *Id.* §§ 404.1520c(b)(3), 416.920c(b)(3). In that situation, the ALJ must then articulate the remaining factors and their application to the persuasiveness of the medical opinion. *Id.*

14

The Regulations require the ALJ to "articulate in [her] determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* §§ 404.1520c(b), 416.920c(b). But when a medical source provides multiple opinions, the ALJ may use a single analysis to evaluate all the opinions from a single source, and the ALJ is "not required to articulate how [she] considered each medical opinion or prior administrative medical finding from one medical source individually." *Id.*

Resolving conflicting evidence with reasonable explanation is an exercise that falls within the ALJ's responsibility and is outside the court's scope of review. *See Mascio* v. *Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015). It is not the court's "role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Fox* v. *Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). The ALJ's opinion contains internal unresolved conflicts and creates confusion over whether substantial evidence supports the RFC determination. *See Elkins* v. *Saul*, No. 4:20-CV-01369, 2021 WL 1884747, at *12 (remanding when the court was "left to guess" about how the ALJ assigned weight to a medical opinion where there was an internal inconsistency between the ALJ's discussion of the medical opinion and the RFC).

An ALJ need not adopt all the finding is a medical opinion he deems persuasive. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (noting that an ALJ need not defer to any medical opinion or prior administrative finding); *Turner* v. *Comm'r of Soc. Sec.,* No. 23-1760, 2024 WL 2764722, at *5 (4th Cir. May 30, 2024) ("ALJs are not required to accept all components of . . . a claimant's limitations just because the ALJ finds them to be generally persuasive.") (citing *Thomas* v. *Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019)).

But an ALJ cannot assign persuasive value to a medical opinion without addressing material conflicts between that opinion and the RFC. *Ezzell* v. *Berryhill*, 688 F. App'x 199, 201 (4th Cir. 2017). "[A]n ALJ cannot implicitly reject portions of a doctor's opinion [that the ALJ found persuasive] that are inconsistent with her RFC" absent adequate explanation of her reasoning. *Adams* v. *Comm'r of Soc. Sec.*, No. 3:20-CV-00224-RJC, 2022 WL 634213, at *3 (W.D.N.C. Mar. 3, 2022); *Clark* v. *Berryhill*, No. 5:17-CV-143-DCK, 2018 WL 3014408, at *5 (W.D.N.C. June 15, 2018). An ALJ's explanation of why he rejects a limitation in an opinion found credible must allow a reviewing court to trace his reasoning. *See Saunders* v. *O'Malley,* No. 5:23-CV-48-RJ, 2024 WL 1116972, at *4 (E.D.N.C. Mar. 14, 2024) (finding remand required where ALJ failed to explain why he rejected a limitation to short instructions, despite finding the state agency psychologists' findings to be persuasive, given that limitation conflicted with jobs ALJ found claimant could perform); *Alonna A.* v. *Kijakazi*, No. CV 22-3115-CDA, 2023 WL 8373378, at *4 (D. Md. Dec. 1, 2023) (finding no logical bridge between the evidence and the RFC where the ALJ failed to explain why the limitations opined by sources whose opinions were found to be persuasive were not fully incorporated into the RFC) (citing *Woods* v. *Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)).

Northrup reported having memory problems since her strokes. Tr. at 389. Although she displayed some confusion and had trouble with recall, the examiners noted adequate judgement, insight, attention, and concentration. Tr. at 389–90. And her cognitive functioning fell into the borderline to low average range. Tr. at 391.

McGilberry and Dye offered no diagnosis of a psychological condition. *Id*. But they pointed out she had low cognition. *Id*. The examiners determined that Northrup could understand,

retain, and follow instructions to perform simple, routine, repetitive tasks. *Id*. And she would struggle to maintain concentration, persistence, and pace for more complex tasks. *Id*.

The ALJ determined that the consultative examiners' assessment was persuasive. Tr. at 26. The evaluation supported their conclusions. *Id.* And their findings tracked other evidence in the record, including unremarkable mental status examinations, Northrup's denial of mental health symptoms, and a lack of specialized mental health treatment. *Id*.

But the RFC does not address the consultative examiners' determination that Northrup would have trouble maintaining concentration, persistence, and pace for more than simple tasks. What's more, the ALJ did not explain why the RFC excludes any non-exertional restrictions that would address that finding.

In addition to the psychological consultative examiners' assessment, records relating to Northrup's issues in this functional domain include the consultative physical examination which remarked that her concentration was "not good." Tr. at 24. Northrup testified that she experienced problems with her memory since suffering two strokes. Tr. at 22. And her husband noted that she had a poor memory. Tr. at 27.

There is also evidence of Northrup's physical conditions, including obesity and osteoarthritis in her knees. Objective studies have confirmed severe degenerative changes, described as bone-on-bone and being at the end-stage of osteoarthritis. Tr. at 23. Treatment with medications and steroids failed to provide lasting relief of her pain symptoms, and providers have recommended knee replacement surgery. *Id*. So perhaps Northrup's pain plays a role in her ability to maintain concentration, persistence, and pace. *See* SSR 96-8p (observing that pain could cause mental limitations that may affect one's capacity to do work-related mental activities); *Green* v. *Berryhill*, No. 3:17-CV-00482-RJC, 2019 WL 1331754, at *5 (W.D.N.C. Mar. 25, 2019)

(affirming disability decision where ALJ correlated claimant's limitations in concentration, persistence, and pace to his physical pain, which claimant alleged was the reason he could not concentrate).

The ALJ offered reasons for finding the consultative examiners' assessment persuasive. And she specifically noted their conclusion that complex tasks could be challenging for Northrup. Tr. at 26. And the ALJ identified no findings in their report with which she disagreed.

The ALJ did not explain, nor is it apparent, why the RFC does not account Northrup's limitations in concentrating, persisting, and maintaining pace for more complex tasks. The disability decision thus contains internal and unresolved conflicts which casts doubt on a substantial evidence finding. *See Elkins*, 2021 WL 1884747, at *12.

Without an explanation, it is unclear whether the ALJ disregarded or rejected the limitation that McGilberry and Dye found but the RFC did not incorporate. And it is uncertain whether the RFC determination properly reflects all of her well-supported limitations. So the court cannot conclude that substantial evidence supports the ALJ's determination.

In sum, there is evidence that supports the consultative examiners' finding that Northrup may have difficulty sustain concentration, persistence, and pace for complex tasks. Northrup presents a meritorious argument. The undersigned thus recommends that the court thus grant her relief and remand the matter for further consideration of this issue.

III.    Conclusion

For all these reasons, the undersigned recommends that the court grant Northrup's request for relief (D.E. 10), deny Bisignano's request for relief (D.E. 12), and remand this matter to the Commissioner for further consideration.

The Clerk of Court must serve a copy of this Memorandum and Recommendation (M&R) on each party who has appeared in this action. Any party may file a written objection to the M&R within 14 days from the date the Clerk serves it on them. The objection must specifically note the portion of the M&R that the party objects to and the reasons for their objection. Any other party may respond to the objection within 14 days from the date the objecting party serves it on them. The district judge will review the objection and make their own determination about the matter that is the subject of the objection. If a party does not file a timely written objection, the party will have forfeited their ability to have the M&R (or a later decision based on the M&R) reviewed by the Court of Appeals.

Dated:  May 27, 2026

_____
Robert T. Numbers, II
United States Magistrate Judge

Case 2:25-cv-00026-D-RN    Document 15    Filed 05/27/26    Page 19 of 19